Filed 1/12/16  P. v. Little CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


THE PEOPLE,

    Plaintiff and Respondent,                        A140502

    v.                                            (Alameda County
                                                    Super. Ct. No. C171014)

DARVELLE B. LITTLE,

    Defendant and Appellant.

_____/

       A jury convicted appellant Darvelle B. Little of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)) and second degree robbery (Pen. Code, § 211) and found true various sentencing enhancement allegations.  The trial court sentenced Little to state prison.  Little appeals.  He contends the court: (1) erred by declining to hold a hearing on his second *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) motion; (2) denied him his right to self-representation under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*); and (3) erred by denying his *Batson/Wheeler* motion.[1]

       We reject Little's second and third claims, but we agree the court erred by failing to allow Little to state his reasons for his dissatisfaction with trial counsel.  We remand

---

[1]    *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), disapproved on another ground in *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*).  Unless noted, all further statutory references are to the Penal Code.

1

the matter to the trial court to conduct a *Marsden* hearing on Little's claim he was not being "represented right" and for such further proceedings as may be required.

FACTUAL AND PROCEDURAL BACKGROUND

We provide an overview of the facts here and additional factual and procedural details in the discussion of Little's specific claims.

*Prosecution Evidence*

In September 2012, Jonathan Chee attended a concert in Oakland with a group of friends, including Brahm Patterson. Chee and his friends drank beer, and smoked cigarettes and marijuana. Little — whom Chee did not know — approached Chee's group. Little shared a joint with Chee, and asked him about obtaining marijuana. Chee told Little he could "'get some'" marijuana for him. The two men exchanged telephone numbers. Throughout September 2012, Chee and Little exchanged calls and text messages "to deal with [the] marijuana."

On September 30, 2012 — and at Little's request — Chee and Patterson drove to Oakland to sell Little half a pound of marijuana. When Chee and Patterson arrived at the appointed location, Little was not there. Little directed them to a second location, and then a third. When Chee and Patterson arrived at the third location, Chee saw Little. Little got into the backseat of Chee's car and directed Chee to an alleyway. Chee drove to the alley, parked, and opened the trunk of the car. In the trunk was a black messenger bag containing a Ziploc bag full of marijuana and Chee's personal items.

When Chee opened the messenger bag to show Little the marijuana, Little drew a small, silver gun and pressed it into Chee's right thigh. Little whispered "'Either give me the weed, or I am going to shoot you'" and grabbed the strap of the messenger bag. Chee said, "'Don't take my black bag,'" and held onto it. The two men struggled over the messenger bag. Little shot Chee in the left leg and ran away with the Ziploc bag of marijuana. An ambulance took Chee to a hospital where he had surgery to repair damage to his femoral artery and a branch of his femoral vein. Without medical attention, Chee would have bled to death.

2

Little made numerous phone calls in jail. During one call, Little asked his friend to "[g]et rid" of his phone. In other calls, Little expressed anger upon learning the mother of his child had spoken to the prosecutor.

*Defense Evidence*

Little admitted he was a drug dealer. He described meeting Chee, and their communication in the days preceding the incident. Chee agreed to sell Little a pound of marijuana. Little sold some of the marijuana, but owed Chee money. Little and Chee arranged to meet on September 30, 2012; Little would repay Chee, and Chee would provide Little with additional marijuana to sell. Chee parked his car in the alley and asked Little "for the money[.]" Little had the money but did not show it to Chee because he "wanted to make sure [Chee] still had the weed." At that point, Chee began cursing at Little and demanding the money. Chee eventually showed Little the marijuana, which was in a Ziploc bag, wrapped in a t-shirt. As Little smelled the marijuana, he felt the bag jerk. Chee snatched the bag away from Little, pulled a "little silver gun" from his waist, and pointed it at Little. Chee said, "'Fool. I am not playing with you. Give me my fucking money.'"

Little thought Chee was going to shoot him, so he lunged for the gun. As the men struggled, the gun went off and Chee's grip on the gun loosened. Little pushed Chee off of him and ran away; as he ran, he looked over his shoulder and saw Chee on the ground, pointing the gun at him. Little admitted disposing of his phone before he was arrested; he also explained the phone calls he made in jail. On cross-examination, Little admitted lying in a police interview.

DISCUSSION

I.

*The Court Erred by Failing to Allow Little to State Reasons
for His Dissatisfaction with Trial Counsel*

A.    Background

On August 29, 2013, Little moved to substitute counsel pursuant to *Marsden*. At the *Marsden* hearing, Little complained his attorney had "waive[d] time[,]" had not filed

3

various motions, and had told Little he would "lose [his] case." Defense counsel explained that he had waived time to conduct discovery, including subpoenaing Little's cell phone records. Counsel noted he had filed a bail motion at Little's request, and explained why he had not filed a motion to set aside the information, a motion to suppress, or a motion challenging the photographic lineup. Counsel also described the discovery he had given Little, who wanted "[w]hatever the DA has." Finally, counsel noted he had discussed trial defenses with Little and advised him to consider a plea bargain because of the strength of the prosecution's case and Little's potential prison sentence.

The court denied the *Marsden* motion. It concluded defense counsel had "been doing everything that a competent attorney could," and had given Little a "candid assessment of the case." The court explained defense counsel's assessment of the case did not "mean that the attorney is not going to be competent in representing you. . . . [I]f you do decide to go to trial, I feel confident that [defense counsel] is going to competently represent you." The court scheduled a pretrial hearing for September 17, 2013. Trial was scheduled to begin on September 23, 2013.

At the outset of the pretrial hearing on September 17, 2013, the judge said, "Mr. Little, I talk with lawyers. I don't talk to folks that are represented by counsel." Little said, "I'm not being represented" and defense counsel explained, "Your Honor, I think Mr. Little wants a *Marsden* motion." The judge responded, "[h]e just had one. He's not getting another one. He just had one." When Little asked to address the court, the judge said, "No. You had one . . . not even three weeks ago[.]" Then Little asked, "Can I represent myself? I would rather represent myself." The judge responded, "Do you want to do that? You can represent yourself. So before you do that, there is a form you have to fill out and I can give you that form but let me make a couple of comments about this.

"You have a right under the constitution to represent yourself. My job is to make sure if you exercise that right you understand what you're doing; that you're doing it freely, voluntarily, and knowingly; that . . . you understand what you're getting into; that you're not doing it just because you're annoyed with me, because you're annoyed with

4

the lawyer that you have that the Court feels is doing a good job for you because you've already had a hearing on this point.

"And it's not back and forth. . . . If you're going to represent yourself, that's it. You're representing yourself all the way through to the end. There's no take-backs. You are a grown man. I advise you of what the consequences are. If you make that decision, you rise or fall on it. There is no take-backs because we do not have time for that around here, you changing your mind, I want a lawyer back, now I don't want a lawyer, depending upon how you feel at any given moment.

"If you make the decision to represent yourself, then that's going to be it. You're going to be at trial, picking a jury, the D.A.'s making all sorts of motions and citing code sections, you won't know what she's talking about, and when you say to me or to my colleague who is dressed like me, I want my lawyer back, they're going to say no. So I just want to make sure you understand that.

"If you have all that in mind and want to do that, that's fine, but I don't want you to say, No one told me that I couldn't get my lawyer back when I wanted my lawyer back. So it is a very, very long ugly road to hoe by yourself, sitting there in a felony jury trial, picking a jury and fighting off these motions the D.A. is making about stuff you don't even understand. People do it. They're usually sorry. They do it in my court, they come over and they're sorry—in my trial court and say, Judge, I decided I want a lawyer and I say, No, remember we had that discussion with the judge, . . . If you make the decision, that's it.

"So if you want to explore that further, representing yourself, I'm happy to give you the form and have you go over that so I can be assured you're making the decision knowingly, intelligently, and voluntarily. Short of that, this is your lawyer. We already had a . . . hearing with you less than three weeks ago as to why [defense counsel] should be discharged. That judge denied it so those are your options. [Defense counsel] or yourself." Little then requested a continuance to get "a real lawyer. I'm not being represented right." The court responded, "You have a real lawyer . . . . an excellent lawyer who knows what he's doing, who defends people in these courts every day and

has done so for years." The judge told Little he could hire another attorney, but that attorney would need to be ready for trial on Monday, September 23, 2013. Little said he would "have somebody . . . by Monday" but did not hire a new attorney.

B. The Court Erred by Failing to Allow Little to Explain Reasons for Being Dissatisfied with Trial Counsel

On appeal, Little contends the court erred by failing to conduct a second *Marsden* hearing. According to Little, the judge "expressed hostility" toward his *Marsden* motion and "refused out of hand to hear it." "When a defendant seeks new counsel on the basis that his appointed counsel is providing inadequate representation—i.e., makes what is commonly called a *Marsden* motion [citation]—the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance." (*People v. Smith* (2003) 30 Cal.4th 581, 604.) We agree with Little and conclude the court erred by refusing to give him an opportunity to state reasons for his dissatisfaction with trial counsel.

*People v. Reed* (2010) 183 Cal.App.4th 1137 (*Reed*) — not cited by Little — is instructive. In that case, the defendant filed two unsuccessful pretrial *Marsden* motions and a jury convicted him of various sex offenses. (*Id.* at pp. 1139, 1140-1141). At his sentencing hearing, the defendant moved "for new trial on the grounds of incompetence of counsel." (*Id.* at p. 1140.) Defense counsel stated the defendant was "asking me to ask the court to grant him a new trial based on my incompetence" and that counsel "cannot make it for him" and did not know what vehicle to use to make such a motion. (*Id.* at p. 1142.) Defense counsel later reiterated the defendant was "indicating to me he wants to bring that motion regarding my incompetence" but the trial court did not inquire into the basis for the defendant's incompetence claim. (*Id.* at p. 1142.) Instead, the court stated: "any dialogue you may have had with your attorney, any preparation that may have taken place for your case is something that is not in the realm of things that I am privy to. . . . [¶] So, I am not in the position to evaluate whether she was effective counsel or not[.]" (*Id.* at p. 1143.)

On appeal, we concluded the trial court was obligated to inquire into the basis for counsel's alleged incompetence, and its failure to conduct such an inquiry was reversible error. (*Reed, supra,* 183 Cal.App.4th at p. 1148.) First, we determined the defendant's "expressed desire to pursue a motion for new trial based on counsel's incompetence, the fact that defense counsel said, 'I cannot make it for him,' and the context of [the defendant's] prior unsuccessful *Marsden* motions, made it sufficiently clear that [the defendant] was in fact requesting substitute counsel to pursue the motion for new trial." (*Id.* at pp. 1145-1146.) Next, we concluded the court's "[f]ailure to undertake the 'imperative duty' to make the requisite *Marsden* inquiries on such issues was error." (*Id.* at p. 1148.) As we explained, "[t]he trial court here made no inquiry at all. That lack of inquiry constitutes reversible error." (*Id.* at p. 1145.)

We then concluded the "complete absence of any record" required remand because we could not "determine from the silent record before us whether further inquiry would have led to a different result." (*Reed, supra,* 183 Cal.App.4th at pp. 1148-1149, fn. omitted.) Other cases have reached similar results. (*People v. Hill* (2013) 219 Cal.App.4th 646, 653 ["[b]ecause defendant might have been able to demonstrate that his attorney was not affording him adequate representation, the court's failure to hold a hearing resulted in a record which precludes effective review, as was the case in *Marsden*"]; *People v. Knight* (2015) 239 Cal.App.4th 1, 3 [court's failure to prevent the defendant "from fully articulating the reasons his counsel had been ineffective" required remand "for the limited purpose of conducting a *Marsden* hearing"].)

As the Attorney General recognizes, a trial court's failure to afford a defendant "an opportunity to state the reasons for his dissatisfaction with his attorney results in a record which is insufficient for meaningful review but the trial was otherwise free of error, it is appropriate to reverse the judgment and remand the cause for the limited purpose of conducting a postjudgment *Marsden* hearing. [Citations.]" (*Hill, supra,* 219 Cal.App.4th at p. 653.) Here as in *Reed*, the court refused to allow Little to explain why he felt he was "not being represented" or not "being represented right." On this silent record, we cannot conclude beyond a reasonable doubt a fully-articulated *Marsden*

motion would have been unsuccessful.  (See *People v. Knight, supra,* 239 Cal.App.4th at p. 9.)  "In light of that set of unique circumstances, we will reverse the judgment and remand the matter with directions to the trial court to conduct a posttrial *Marsden* hearing and to exercise judicial discretion to order a new trial, reinstate the judgment, or proceed otherwise as authorized by law." (*People v. Lopez* (2008) 168 Cal.App.4th 801, 815.)

## II.

### *Little's Faretta Claim Fails*

Next, Little claims the court "incorrectly" advised him "that if he took on representing himself, he would never again be able to have the court appoint an attorney to represent him." "'A defendant in a criminal case . . . has the right to be represented by counsel at all critical stages of a criminal prosecution.' [Citations.]" (*People v. James* (2011) 202 Cal.App.4th 323, 328.)  A defendant also "'possesses the right to represent himself or herself.  [Citation.]' [Citation.]" (*Id.* at pp. 328-329.)  When presented with a request for self-representation, the trial court must make the defendant "aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" (*Faretta*, *supra,* 422 U.S. at p. 835.)

Here, the court did not — as Little claims — "unduly pressure[ ]" him into not pursuing his right to represent himself.  "Rather, the court properly advised [Little] of the pitfalls of self-representation." (*People v. Jenkins* (2000) 22 Cal.4th 900, 961 [trial court did not coerce the defendant into withdrawing *Faretta* motion].)  Nor did the court "incorrectly advise" Little by telling him he could not change his mind during trial and request a lawyer.  "'A trial judge is not obligated to restore counsel if a *Faretta* defendant changes his mind in midtrial and no longer wants to represent himself.  A request for restoration of the services of counsel is left to the sound discretion of the trial court . . .'" (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 555.)

Little's reliance on *U.S. v. Farias* (9th Cir. 2010) 618 F.3d 1049 (*Farias*) does not alter our conclusion.  In *Farias*, the district court told the defendant if he proceeded pro se, the court would not grant any additional time for him to prepare for a trial scheduled

8

to start the next day.  (*Id.* at pp. 1054-1055.)  On appeal, the defendant argued the district court erred "by leading him to believe he would not have adequate time to prepare himself for trial which, . . . amounted to the outright denial of his request to proceed pro se." (*Id.* at p. 1052.)  The Ninth Circuit Court of Appeals agreed and concluded allowing the defendant only 24 hours to prepare for trial rendered the right to self-representation "'meaningless.'" (*Id.* at p. 1054.)  Little's reliance on *Farias* is misplaced for at least two reasons.  First, we are not bound by lower federal court decisions.  (*People v. Williams* (1997) 16 Cal.4th 153, 190.)  Second, *Farias* is distinguishable.  Here and in contrast to *Farias*, the court did not mislead Little or restrict the amount of time he would have to prepare for trial.  We reject Little's claim of *Faretta* error.

III.

*The Court Properly Denied Little's Batson/Wheeler Motion*

Little, an African-American, contends the prosecutor exercised a peremptory challenge to remove E.B., the only African-American prospective juror, because of her race, and the court erred by denying his *Batson/Wheeler* motion.

A.    Background

During the court's voir dire, E.B. stated she lived in Livermore and was retired from working at AT&T.  She had never served on a jury, had "been the victim of a crime[,]" and had "close friends and associates" who were attorneys and police officers.  E.B.'s home and car were burglarized.  When the prosecutor conducted voir dire, E.B. stated her husband was retired from working at the Alameda County Office of Education in "San Leandro at juvenile hall."  One of E.B.'s children was a social worker.

The prosecutor used her ninth peremptory challenge to excuse E.B. and defense counsel made a *Batson/Wheeler* motion, arguing the evidence strongly suggested "race was a consideration" in excusing her.  According to defense counsel, "nothing that [E.B.] disclosed . . . stands out . . . as somebody the prosecution would necessarily want to get rid of."  Defense counsel commented E.B. had a "stable family environment" and prosecution-friendly characteristics.  At the court's request, the prosecutor stated her reasons for excusing E.B.

9

First, the prosecutor noted she had "no control" over jury pool composition and argued "courts do not hold against the government the fact that the [jury] panel lacked African-American members." Second, the prosecutor explained she excused E.B. because: (1) she was late to court twice, on one occasion for 15 to 20 minutes, which showed a "disregard for the importance of this process[;]" (2) the occupations of E.B.'s husband and daughter "reflect[ed] an orientation toward rehabilitation and sympathy for defendants[;]"[2] (3) E.B. "constantly had her head in her hand" and showed "a lack of interest in the proceeding[;]" and (4) the prosecutor had a hard time reading E.B. and could "not get an emotional reaction from her at all[.]"

In response, defense counsel argued he did "not observe any such gestures [or] body language" by E.B. indicating she was disinterested, and that a Caucasian female juror appeared to be sleeping but the prosecutor "did not exercise a challenge against [her]." Defense counsel also argued E.B.'s tardiness did not necessarily indicate a lack of respect for the proceeding. After hearing additional argument, the court denied the *Batson/Wheeler* motion. In a thorough and detailed ruling, the court concluded Little made a prima facie case of racial discrimination, but the prosecutor had "legitimate and race neutral reasons" for excusing E.B., including her tardiness, which "inconvenience[d]" the parties and the jurors, and which "offended" the court. The court explained that its own observations "corroborate[d] and substantiate[d]" the prosecutor's comments regarding E.B.'s demeanor; the court noted E.B.'s behavior and body language were legitimate and race neutral reasons to excuse her. Finally, the court determined the prosecutor's concern about the professions of E.B.'s family members was legitimate and race-neutral.

---

[2]     The prosecutor had excused a Caucasian juror for his lack of punctuality. She excused another Caucasian juror who had "worked in jails" and whose husband oversaw education in jails because of the possibility of bias or sympathy toward the incarcerated.

B.    Substantial Evidence Supports the Denial of Little's *Batson/Wheeler*
      Motion

The test for analyzing *Batson/Wheeler* claims is well-established.  "A party who excludes prospective jurors based on race violates the federal and state Constitutions. [Citation.]  When examining allegations of such misconduct, there 'is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination.'  [Citation.]  When a defendant claims a prosecutor has challenged a prospective juror based on an impermissible ground, the following procedures apply:  'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination."'  [Citation.]"  (*People v. Hensley* (2014) 59 Cal.4th 788, 802 (*Hensley*), quoting *Johnson v. California, supra,* 545 U.S. at p. 168.)  "At this so-called third stage of the *Batson* inquiry, the trial court often bases its decision on whether it finds the prosecutor's race-neutral explanations for exercising a peremptory challenge are credible.  '"Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."'  [Citations.]"  (*People v. Jones* (2013) 57 Cal.4th 899, 917.)

""'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions.  [Citation.]  'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'"  [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham

excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.'"' [Citation.] 'When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings.' [Citation.]" (*Hensley, supra,* 59 Cal.4th at pp. 802-803.) The parties agree "this is a step three case," requiring us to analyze "whether the trial court properly accepted the race-neutral reasons given by the prosecutor." (*People v. Mai* (2013) 57 Cal.4th 986, 1050.)

We conclude the court made a sincere and reasoned attempt to evaluate the prosecutor's nondiscriminatory justifications offered, and the court's findings are supported by substantial evidence. (*People v. Chism* (2014) 58 Cal.4th 1266, 1316; *People v. Huggins* (2006) 38 Cal.4th 175, 227.) A prospective juror's tardiness is a legitimate, race-neutral reason for excusing that juror. (*People v. Davis* (2008) 164 Cal.App.4th 305, 313 [prosecutor had "plenty" of race-neutral reasons for excusing the prospective juror, including her lack of punctuality]; *People v. Watson* (2008) 43 Cal.4th 653, 679 [record supported prosecutor's conclusion that prospective juror was too immature and irresponsible, where the juror "had been late twice"].) Here, E.B. was late to court — on one occasion for 15 to 20 minutes — which inconvenienced the parties and the jurors, and showed a "disregard for the importance" of Little's trial.

Peremptory challenges are also properly made in response to "'"bare looks and gestures,"'" or the demeanor of a prospective juror. (*People v. Turner* (1994) 8 Cal.4th 137, 171, overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) "Rigid jurors who appear emotionally detached and terse may be divisive during deliberations. They may not perform well as open-minded jurors willing and able to articulate their views and persuade others." (*Hensley, supra,* 59 Cal.4th at p. 803.) Here, E.B.'s body language — observed by the prosecutor and the court — showed "a lack of interest in the proceeding" and was a legitimate, race-neutral reason for excusing her.

Additionally, the prosecutor's concern about the professions of E.B.'s family members, one who had worked in juvenile hall and the other as a social worker, was race-

12

neutral and had "'"some basis in accepted trial strategy'"" [citation] insofar as it stemmed from a concern about the general attitudes and philosophies persons in that profession might harbor." (*People v. Mai*, *supra,* 57 Cal.4th at p. 1053 [social worker]; *People v. Semien* (2008) 162 Cal.App.4th 701, 708 [prosecutor excused pastor for a legitimate, race-neutral reason: he was "in the business of forgiveness"].)[3]

We conclude the court properly denied Little's *Batson/Wheeler* motion.

DISPOSITION

The judgment is reversed with directions to the trial court to conduct a posttrial *Marsden* hearing into Little's claims at the September 17, 2013 hearing that he was not "being represented" and "not being represented right" and to "exercise judicial discretion to order a new trial, reinstate the judgment, or proceed otherwise as authorized by law." (*People v. Lopez* (2008) 168 Cal.App.4th 801, 815; see also *People v. Reed* (2010) 183 Cal.App.4th 1137, 1149-1150.)

---

[3] Little claims "comparative juror analysis demonstrates that the prosecutor's reasons for challenging [E.B.]. were pretextual. [Citation.] The argument fails." (*Hensley, supra,* 59 Cal.4th at p. 803.) "[F]or a comparison to be probative, jurors need not be identical in all respects, [citation] but they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 107.) Significant differences existed between E.B. and prospective jurors numbers 1, 2, 6, 8, and 9. (*People v. Vines* (2011) 51 Cal.4th 830, 852.) As a result, Little's "proposed comparative juror analysis does not establish that the prosecutor's reasons for excusing [E.B.] were pretextual." (*People v. DeHoyos, supra,* 57 Cal.4th at p. 106.)

_____

Jones, P.J.


We concur:


_____

Simons, J.


_____

Bruiniers, J.

14